UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

═══════════════════════════════

DENISE K. KRUPA,

                         Plaintiff,                    **REPORT AND
                                                       RECOMMENDATION**

        v.                                             13-CV-76A

DUNKIRK SPECIALTY STEEL, LLC,

                         Defendant.

═══════════════════════════════

## I)  INTRODUCTION

        The Hon. Richard J. Arcara referred this case to this Court under 28

U.S.C. § 636.  Pending before the Court is a motion (Dkt. No. 33) by defendant

Dunkirk Specialty Steel, LLC ("Dunkirk") for summary judgment dismissing the

complaint filed by plaintiff Denise Krupa ("Krupa").  Dunkirk insists that it fired

Krupa after repeated violations of its absentee policy, a "no-fault" policy that does

not address any other aspect of an employee's performance.  In response, Krupa

stands by and repeats the allegations from her complaint that Dunkirk treated her

absences differently than male employees.  Krupa also repeats allegations that

she suffered disparate work conditions including a lack of training and restroom

facilities that male employees received.

        The Court scheduled oral argument for September 17, 2014, but Krupa's

attorney did not attend.  The Court now has deemed the motions submitted on

papers under Rule 78(b) of the Federal Rules of Civil Procedure ("FRCP").  For

the reasons below, the Court respectfully recommends granting Dunkirk's

motion.

## II)  BACKGROUND

This case concerns allegations that Dunkirk subjected Krupa, its only

woman machinist, to limited training, inferior working conditions, and unfair

disciplinary tactics, all because of her sex.  Dunkirk is a steel processor that

"produces finished bar, rod and wire products in a wide variety of specialty steel

grades sold to service centers, forgers and original equipment manufacturers."

(Dkt. No. 33-1 at 1.)  Among other departments and employees, Dunkirk has a

Maintenance Department and employs machinists in it.  In the spring of 2010,

Dunkirk placed an advertisement in a local newspaper announcing an opening

for a machinist position.  Among other requirements, Dunkirk explained in the

advertisement that the open position "is not a training position and candidate

must be fully capable of doing the full scope of the job immediately."  (Dkt. No.

33-2 at 2.)  Dunkirk did not list the specific duties that the machinist would

perform but did set forth skills that the machinist needed to have.  "Qualified

candidate must be proficient at reading blueprints, set up and operate lathes

(manual & CNC), milling machines, drill presses, saws, shaper, grinders and any

and all tools of the trade with minimal supervision.  Applicant must be capable in

using machinist squares, calipers, micrometers, dividers, protractor, level gauges, feeler gauges, dial indicators, etc.  These are prerequisite skills and proof of experience must be documented." (*Id.*)  Krupa applied and interviewed for the position.  At the interview, Dunkirk told Krupa that machining laboratory test pieces would make up a large part of the job and that she was more qualified than another applicant who also was qualified for the job.  (*See* Dkt. No. 33-6 at 42–45.)  Dunkirk hired Krupa on April 8, 2010.  Krupa became Dunkirk's only woman machinist.  Krupa spent about half of her time working on test pieces, as did at least one other machinist.  (*See id.* at 53.)  Krupa also operated manual lathes.  (*Id.* at 55.)  While Dunkirk had some flexibility in assigning its machinists different responsibilities, their pay and promotions depended only on the machinist title and not specific tasks assigned to them.  (*See id.* at 75.)

Dunkirk's absentee policy governed Krupa's job as well as those of all company employees.  Under the policy, "[a]n employee is absent when he fails to report for work as scheduled."  (Dkt. No. 33-4 at 2.)  Employees who must call in sick, also known as "reporting off," have to call at least an hour before the start of the scheduled shift and have to show a good reason for the absence.  Regardless of the reason, "reporting off" subjected employees to the disciplinary point system under the absentee policy.  The point system "will be used as a guideline for the supervisor to initiate corrective action with his employees who

3

are excessively absent and/or late.  The point system is a no-fault type system which takes into account some reasonable allowance for missed work.  Each employee will be treated the same and equally." (*Id.* at 3.)  Employees would accrue one half-point for late arrival up to 30 minutes.  Employees would accrue one point for reporting off under any circumstances; absence altogether from a scheduled shift; late arrival beyond 30 minutes; or leaving work early.  (*Id.*)  Whenever employees accumulated more than two points within a 90-day span, they would face the next level of discipline that they had not yet faced under the policy, starting with a written warning for a first offense and proceeding to a one-day suspension, three-day suspension, and five-day suspension subject to discharge.  Dunkirk stressed that the disciplinary point system "will be used only to evaluate absences and lateness.  All other work rules will be governed by disciplinary procedures set forth by the Company." (*Id.* at 4.)  Medical leave approved in advance by the company and by a qualified physician would not be subject to the disciplinary point system.  (*Id.*)

Dunkirk's employment records indicate that Krupa had numerous absences that led to her termination.  Between January 1, 2011 and January 14, 2012, Krupa accumulated 31 unpaid sick or accident days and 23 absences.  (Dkt. No. 33-3 at 4; Dkt. No. 33-4 at 26–40.)  Krupa also had absences during her probationary period in 2010.  As a result, Krupa progressed through all of the

4

disciplinary actions possible under the absentee policy.  Dunkirk gave Krupa a written warning on May 18, 2010; a verbal warning on September 19, 2011; a one-day suspension on November 2, 2011; a three-day suspension on November 16, 2011;[1] and a five-day suspension with termination on January 12, 2012.  (Dkt. No. 33-6 at 82–93.)

While Krupa was employed at Dunkirk and building up her absentee record, she made complaints about her work environment that did not relate to the absentee policy.  Krupa complained repeatedly to her union and to Dunkirk's supervisors and in-house counsel that she was a machinist and not just a test piece operator.  Dunkirk, in Krupa's view, repeatedly denied her chances to assume more responsibilities and to receive training on additional equipment.  At one point when raising the issue of training, one of Krupa's supervisors allegedly told her a comment to the effect that her training was limited because "she was only qualified to push a button."  Krupa complained that she did not receive enough credit for catching an error involving "collet pads"[2] that saved Dunkirk money.  Krupa complained that she had no women's restroom or locker room as close to her workstation as male machinists had to theirs.  Krupa allegedly received workplace discipline for being outside of her work area on December 2,

---

[1] Krupa served only one of the three days because her union filed a grievance about the suspension.  The record does not indicate the ultimate outcome of that grievance.

[2] The record alternately uses the terms "collet pads" and "collection pads" without explaining whether both terms refer to the same object and what that object is.  (*Compare, e.g.*, Dkt. No. 1 at 4 ¶¶ 20-21 with Dkt. No. 33-6 at 7.)

2011 and complained that she had to step out of her work area to acquire the materials necessary for her assigned tasks.  Krupa also believes that this particular discipline occurred in response to a complaint that she filed with the Occupational Safety and Health Administration ("OSHA") that led to Dunkirk receiving a citation.  Meanwhile, according to Krupa, other employees had accidents that cost Dunkirk considerable amounts of money or accumulated significant numbers of points under the absentee policy without receiving discipline.  Krupa cites one former coworker, Peter Spanuzza ("Spanuzza"), by name as an employee who did not receive points for an absence in December 2011.

Krupa believed that Dunkirk discriminated against its only female machinist and began seeking remedies shortly after her termination.  Sometime after termination, Krupa applied for unemployment insurance benefits.  Dunkirk apparently opposed the application, and an administrative law judge apparently sided with Krupa and downplayed her absences as technical violations that did not rise to "misconduct," however the administrative law judge chose to define that term.  The Court uses the word "apparently" when describing Krupa's unemployment insurance application because Krupa did not attach the application or the administrative law judge's decision to any of her papers.  The application and decision thus are not in the record.  On March 6, 2012, Krupa

filed a discrimination complaint with the New York State Division of Human Rights ("NYSDHR").  (Dkt. No. 33-6 at 2–9.)  In the application, Krupa checked off boxes indicating that she suffered sex discrimination with respect to termination, suspension, sexual harassment, denial of training, differential job duties, disciplinary notices, and denial of bathroom facilities.  Krupa attached a statement repeating the complaints that she had made to Dunkirk officials about training, collection pads, restroom facilities, and differential application of the absentee policy.  For dual filing purposes, the NYSDHR forwarded Krupa's complaint to the Equal Employment Opportunity Commission ("EEOC").  (*Id.* at 11.)  In a decision dated August 29, 2012, the NYSDHR found no probable cause to believe that Dunkirk discriminated against Krupa.  (*Id.* at 14–15.)  Among other findings, the NYSDHR determined that Dunkirk had no obligation to Krupa regarding cross-training at different machines and that Dunkirk provided appropriate restroom and locker room facilities.  The NYSDHR also found no differential application of Dunkirk's absentee policy.  The EEOC adopted the NYSDHR's findings and issued a "right to sue" letter on October 26, 2012.  (*Id.* at 20.)

Krupa began this litigation by filing her complaint on January 24, 2013.  In her complaint, Krupa restated the allegations that she made to Dunkirk officials and to the NYSDHR.  The complaint contains two causes of action.  In the first

7

cause of action, Krupa accuses Dunkirk of discriminating against her on the basis of sex in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e to 2000e-17 (Westlaw 2014).  In the second cause of action, Krupa accuses Dunkirk of discriminating against her on the basis of sex in violation of the New York State Human Rights Law ("NYSHRL"), N.Y. Executive Law §§ 290–301 (Westlaw 2014).

Dunkirk filed the pending motion on August 11, 2014 and makes several arguments in favor of dismissal without the need for a trial.  Dunkirk wants Krupa's second cause of action dismissed as a matter of law because of the "election of remedies" provision of the NYSHRL.  Specifically, Dunkirk argues that the NYSHRL makes administrative remedies through the NYSDHR and judicial remedies mutually exclusive.  Because Krupa filed a claim with the NYSDHR and because the agency has adjudicated her claim, she now cannot allege a violation of the NYSHRL in court.  Dunkirk next argues that Krupa's complaints about work conditions do not rise to the level of adverse employment actions.  According to Dunkirk, Krupa was not entitled to her preferences regarding training and work responsibilities and suffered no negative consequences when she did not receive her preferences.  The absence of praise for catching the "collet pad" error is not actionable.  Krupa always had adequate restroom facilities.  The disciplinary memo issued in December 2011 did not

change her working conditions, and Krupa never served the three-day suspension anyway.  Finally, Dunkirk argues that Krupa was one of five employees fired in 2011 or 2012 and one of 52 who received discipline under the absentee policy during that time.  The one employee whom Krupa named in her complaint had nowhere near the absentee record that she did.  In that context, according to Dunkirk, Krupa cannot reasonably allege that she suffered from different treatment under the absentee policy because of her sex.

Krupa opposes the motion mostly by citing the allegations in her complaint. Krupa repeats her view that she was hired as a machinist and not just a test piece operator, and that she should have received additional training and opportunities accordingly.  Krupa reiterates her concern about inadequate restroom and locker room facilities.  Krupa stands by her allegation that unspecified other employees accumulated more points under the absentee policy than she did and were not terminated.  As proof, Krupa cites paragraph 44 of her complaint.  (*See* Dkt. No. 38 at 4.)  Krupa also notes that, of the five employees in 2011 and 2012 whom Dunkirk fired, she was the first one and the only woman. "One of the most criteria [sic] disputed facts in the equalable [sic] application of the absentee policy.  According to the Defendant's Affidavit of Vicky Eddy, no males were terminated prior to Plaintiff's termination."  (*Id.* at 7.)  Krupa again cites to her unemployment insurance application and the administrative law judge

who found no misconduct.  Krupa again did not provide a copy of the application

or the decision from the administrative law judge.  Krupa concludes that the

"attendance program although non-discriminatory on its face was applied in a

discriminatory manner as noted above and as set forth in the complaint."  (*Id.* at

5.)  As for Dunkirk's argument about the exclusive nature of remedies under the

NYSHRL, Krupa argues that the Court should exercise supplemental jurisdiction

under 28 U.S.C. § 1367.  Krupa argues further that "the same facts establishing

violations of § 1983[3] and Plaintiff's rights under Title VII support Plaintiff's NYHRL

claims."  (*Id.* at 8–9.)

## III) DISCUSSION

### A)        *Summary Judgment Generally*

Summary judgment "should be rendered if the pleadings, the discovery

and disclosure materials on file, and any affidavits show that there is no genuine

issue as to any material fact and that the movant is entitled to judgment as a

matter of law."  FRCP 56(c)(2).  "As to materiality, the substantive law will identify

which facts are material.  Only disputes over facts that might affect the outcome

of the suit under the governing law will properly preclude the entry of summary

judgment . . . . More important for present purposes, summary judgment will not

lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*

---

[3] Neither cause of action in the complaint cites 42 U.S.C. § 1983.

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted).  "The party

seeking summary judgment has the burden to demonstrate that no genuine issue

of material fact exists.  In determining whether a genuine issue of material fact

exists, a court must examine the evidence in the light most favorable to, and

draw all inferences in favor of, the non-movant, in this case [plaintiff].  Summary

judgment is improper if there is any evidence in the record that could reasonably

support a jury's verdict for the non-moving party."  *Marvel Characters, Inc. v.

Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).

### B)      *Krupa's NYSHRL Cause of Action*

Although Krupa's discrimination cause of action under the NYSHRL

appears second in her complaint, the Court will address it first because Dunkirk's

challenge to it would eliminate it before any factual analysis.  Section 297(9) of

the NYSHRL begins and ends with clauses that create a metaphorical fork in the

path to a remedy for an injury.  The beginning clause states that "[a]ny person

claiming to be aggrieved by an unlawful discriminatory practice shall have a

cause of action in any court of appropriate jurisdiction . . . unless such person

had filed a complaint hereunder . . . ."  N.Y. Exec. Law § 297(9).  The ending

clause states the obverse: "No person who has initiated any action in a court of

competent jurisdiction . . . may file a complaint with respect to the same

grievance under this section or under section two hundred ninety-six-a of this

11

article." *Id.* Potential litigants thus may choose an administrative or a judicial

remedy, but not both. "Generally, the remedies of administrative review through

the Human Rights Division or judicial review are mutually exclusive." *Pan Am.*

*World Airways, Inc. v. N.Y.S. Human Rights Appeal Bd.*, 463 N.E.2d 597, 600

(N.Y. 1984) (citations omitted). "The rights of action [that plaintiff] attempts to

assert are self-limiting, statutorily and code-created rights. Consequently,

[plaintiff] can only assert the rights of action as prescribed by the respective

statute and code. Simply put, a party can only exercise a statutory or code-

created right of action as the statute or code provides. Furthermore, there is no

question that the election-of-remedies provisions at issue here apply to federal

courts as well as state." *York v. Ass'n of Bar of City of New York*, 286 F.3d 122,

127 (2d Cir. 2002) (citation omitted).

The mutually exclusive nature of the remedies in the NYSHRL precludes

Krupa's cause of action as well. Dunkirk fired Krupa on January 12, 2014.

Krupa filed a complaint with the NYSDHR on March 6, 2012, just about two

months after her termination. The NYSDHR adjudicated the complaint and

issued a decision on August 29, 2012. That decision, unfavorable to Krupa,

resolved all of Krupa's allegations. Krupa did not appeal the decision within the

NYSDHR, meaning that the decision constituted the end of Krupa's

administrative remedies. Krupa thus falls under the beginning clause of Section

297(9) of the NYSHRL, which means that she does not have a judicial remedy available to her under that statute. Since the second cause of action in Krupa's complaint in this case rests entirely on the NYSHRL, the Court recommends dismissing it entirely.

### C) Krupa's Title VII Cause of Action

Next, the Court will address the first cause of action in Krupa's complaint, which broadly alleges sex discrimination in violation of Title VII. The Court sees three potential theories to assess: disparate treatment or general discrimination, hostile work environment, and retaliation. Krupa has not articulated each of these theories specifically, but the Court will review them for the sake of completeness because different parts of the record hint at each theory.

### i) Disparate Treatment or Discrimination Generally

The Court will review Krupa's disparate-treatment theory, and the other theories, using the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), a framework adapted from the original context of hiring discrimination for other employment scenarios.[4] That framework proceeds in three general steps. "First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if

---

[4] The Supreme Court itself anticipated the need for future adaptations. "The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations." *McDonnell Douglas*, 411 U.S. at 802 n.13.

the plaintiff succeeds in proving the prima facie case, the burden shifts to the

defendant to articulate some legitimate, nondiscriminatory reason for the

[employer conduct in question].  Third, should the defendant carry this burden,

the plaintiff must then have an opportunity to prove by a preponderance of the

evidence that the legitimate reasons offered by the defendant were not its true

reasons, but were a pretext for discrimination."  *Texas Dep't of Cmty. Affairs v.*

*Burdine*, 450 U.S. 248, 252–53 (1981) (internal quotation marks and citations

omitted).  "To avoid summary judgment in an employment discrimination case,

the plaintiff is not required to show that the employer's proffered reasons were

false or played no role in the employment decision, but only that they were not

the only reasons and that the prohibited factor was at least one of the motivating

factors."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008) (internal

quotation marks and citations omitted).

"To establish a *prima facie* Title VII case, a plaintiff must demonstrate (1)

that he belonged to a protected class; (2) that he was qualified for the position he

held; (3) that he suffered an adverse employment action; and (4) that the adverse

employment action occurred under circumstances giving rise to an inference of

discriminatory intent."  *Sassaman v. Gamache*, 566 F.3d 307, 312 (2d Cir. 2009)

(internal quotation marks and citation omitted).  Only the third and fourth

requirements are in dispute in the pending motion.  An adverse employment

action, in turn, would be some kind of decision that Dunkirk applied to Krupa that made some kind of material change in her conditions of employment.  "While there is no exhaustive list of what constitutes an adverse employment action, courts have held that the following actions, among others, may qualify: discharge or demotion, denial of a provisional or permanent promotion, addition of responsibilities, involuntary transfer that entails objectively inferior working conditions, denial of benefits, denial of a requested employment accommodation, denial of training that may lead to promotional opportunities, and a shift assignment that makes a normal life difficult for the employee."  *Little v. Nat'l Broad. Co.*, 210 F. Supp. 2d 330, 377 (S.D.N.Y. 2002) (citations omitted).  "A plaintiff's burden of establishing a *prima facie* case is *de minimis*."  *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001) (citation omitted).

Here, Krupa faces two problems when trying to make a *prima facie* case of discrimination that would raise a genuine issue of material fact.  The first problem is that Dunkirk did not fire Krupa for reasons relating to work conditions.  Dunkirk fired Krupa for repeated violations of the absentee policy.  In her last two years with Dunkirk, Krupa accumulated 31 unpaid sick or accident days and 23 absences.  Krupa has suggested that she had medical justification for at least some of these absences.  The unseen unemployment benefits decision that Krupa cites apparently agreed that Dunkirk's no-fault approach to absences was

15

too technical at times.  Even so, however, Krupa has not denied that her
absences occurred and that Dunkirk applied the absentee policy to her as it was
written on its face.  *Cf. Minott v. Port Auth. of N.Y. & N.J.*, 116 F. Supp. 2d 513,
521–22 (S.D.N.Y. 2000) (granting summary judgment where "[plaintiff's] absence
record was more severe than all of the other officers in her class . . . because
she was the only one who failed to meet two of the absenteeism standards prior
to the conclusion of her probationary year. One of these standards is the Sick
Leave Policy under the Union Contract, according to which an officer who is
absent on five or more separate occasions in a period of twelve months is
classified as 'Below Standard.'  [Plaintiff's] absence record fell within this
category . . . . Thus, [plaintiff's] record was more severe than the records of all
the other members of her recruit class.").  The record is not clear on the ultimate
outcome of the union grievance that spared Krupa from serving her entire three-
day suspension, but Krupa otherwise has not submitted any evidence that
Dunkirk flagged her under the absentee policy when a violation of the policy did
not occur.  At the same time, Dunkirk has submitted evidence that Krupa was just
one of many employees who faced discipline under the absentee policy.  The
discipline records that Dunkirk has submitted show that, like Krupa, employees
who were disciplined received no more than two warnings before progressing
through suspensions or termination.  Dunkirk's records give no indication of

16

repeat offenders of the absentee policy who escaped with repeated warnings.

Theoretically, with respect to some of Krupa's allegations, Dunkirk's records

would not capture repeat offenders who caught breaks and escaped with no

discipline at all.   Krupa, however, has submitted no documents, deposition

testimony, or other evidence that would require a jury to resolve whether Dunkirk

plays favorites with its absentee policy.   At times, Krupa's allegations seem to

hint that Dunkirk's no-fault approach to absences does not do enough to account

for legitimate medical absences or workers-compensation situations.   Such an

accusation would ignore that pre-approved medical leave does not generate

points under the policy.   In any event, whether Dunkirk ought to have more

holistic principles behind its absentee policy lies outside the scope of Title VII.

What matters for this lawsuit is that a reasonable jury could not find for Krupa

because she has not shown that Dunkirk applied the absentee policy harshly

toward her and leniently toward others because of her sex.   "It is axiomatic that

mistreatment at work, whether through subjection to a hostile environment or

through such concrete deprivations as being fired or being denied a promotion, is

actionable under Title VII only when it occurs because of an employee's sex, or

other protected characteristic."   *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir.

2001) (citation omitted).

The other problem that Krupa faces when trying to make a *prima facie* case of discrimination is that the work conditions that she has mentioned do not rise to the level of adverse employment actions.  Even if the Court set aside Krupa's termination under the absentee policy, it could not recommend a jury trial without some indication that Dunkirk subjected Krupa to an inferior employment status because of her sex.  The Court sees no such indication here.  Dunkirk hired Krupa for a machinist position over another candidate because it liked her qualifications better.  Under Dunkirk's policies and under the collective bargaining agreement with its union, the machinist position was a unitary position that paid the same salary regardless of what the daily responsibilities turned out to be. (*See* Dkt. No. 33-6 at 75 ("Q. The machines that you were trained on or not trained on had no bearing on your compensation at all, correct?  A. Correct.").) Dunkirk appears to have given Krupa certain responsibilities related to test pieces and manual lathes and, apart from absences, appears never to have complained about the quality of her work.  Other employees had similar responsibilities.  (*See* Dkt. No. 33-6 at 53–54 (describing how at least one other machinist spent at least 65% of his time on test pieces).)  Krupa had a workstation like the other machinists and had access to restroom facilities within about 100 feet of her workstation.  (*See* Dkt. No. 33-6 at 81.)  Krupa might have wanted better restroom and locker room facilities, but Dunkirk's failure to create

18

them did not materially affect her employment.  Krupa has suggested that

Dunkirk failed to accommodate medical conditions that would require "immediate

access to a restroom" (Dkt. No. 1 at 5; *see also* Dkt. No. 38 at 3), but that issue

sounds more like an issue of reasonable accommodations under the Americans

with Disabilities Act ("ADA") than an issue of sex discrimination under Title VII.

Krupa has no ADA causes of action in this case.  As for job opportunities, Krupa

has repeated allegations that she was promised more training and that she ought

to have received more training.  By itself, however, Krupa's mere wish to have

more responsibilities that would have led to more overtime does not constitute an

adverse employment action.  *Cf. Ewing v. Coca Cola Bottling Co. of N.Y.*, No. 00

CIV. 7020 (CM), 2001 WL 767070, at *6 (S.D.N.Y. Jun. 25, 2001) (denying a

motion to dismiss where, *inter alia*, Black and Hispanic plaintiffs "are assigned to

work exclusively at menial, disgusting and dangerous jobs, such as pallet repair

and cleanup——which require heavy lifting and involves the handling of shelves

and pallets that are contaminated with urine, fecal matter, dead mice, snakes,

roaches, and broken glass——while the more desirable semi-skilled machine

jobs, such as bottle line filler and high/lo operator, are given to white production

workers.").  Her wish also seems unrealistic given her significant absentee

record.  Krupa herself has conceded that Dunkirk had discretion to assign

machinists different responsibilities based on proficiency.  (*See* Dkt. No. 33-6 at

75 ("Q. Do you believe the company has the right to assign machinists to the positions that they think that the individual is most proficient?  A. Yes.").)

As for other allegations about the work environment, the alleged lack of praise for catching a potentially expensive corporate error may or may not implicate employee morale at the company but is not actionable.  *Cf. El-Zayaty v. Univ. of Findlay*, 444 F. Supp. 2d 790, 799 (N.D. Ohio 2006) ("In any event, if those individuals, acting on the basis of discriminatory animus, meant to disparage or diminish plaintiff's achievements by not sending him letters of congratulation, such unequal treatment is not cognizable.").  Likewise, the allegation about workplace accidents is not actionable without more information about similar situations that Krupa experienced that received different treatment.

Overall, Dunkirk hired Krupa over other candidates for a job that paid per contract and whose daily responsibilities fell within Dunkirk's discretion.  As far as the Court can tell from the record, Dunkirk was satisfied with Krupa's work but fired her for excessive absences.  Dunkirk has shown to the Court's satisfaction that no reasonable jury would disagree, and Krupa has failed to make any indication to the contrary.

### ii)     Hostile Work Environment

Next, the Court will assess whether Krupa has made enough of a case of a hostile work environment to submit a genuine, material fact dispute to a jury.  "[A]

plaintiff may establish a violation of Title VII by proving that discrimination based

on sex has created a hostile or abusive work environment . . . . For sexual

harassment to be actionable, it must be sufficiently severe or pervasive to alter

the conditions of the victim's employment and create an abusive working

environment." *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 66–67 (1986) (internal

brackets, quotation marks, and citations omitted).  "A hostile work environment

claim requires a showing [1] that the harassment was sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an

abusive working environment, and [2] that a specific basis exists for imputing the

objectionable conduct to the employer."  *Alfano v. Costello*, 294 F.3d 365, 373

(2d Cir. 2002) (internal quotation marks and citations omitted).  The

pervasiveness requirement is particularly important.  By the very use of the term

"environment," this Title VII theory requires a workplace situation that persists

over time.  *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) ("Conduct that

is not severe or pervasive enough to create an objectively hostile or abusive work

environment—an environment that a reasonable person would find hostile or

abusive—is beyond Title VII's purview.").  "[W]hether an environment is 'hostile'

or 'abusive' can be determined only by looking at all the circumstances.  These

may include the frequency of the discriminatory conduct; its severity; whether it is

physically threatening or humiliating, or a mere offensive utterance; and whether

it unreasonably interferes with an employee's work performance.  The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive.  But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required."  *Id.* at 23.  "Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness.  But it is well settled in this Circuit that even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace."  *Alfano*, 294 F.3d at 374 (citations omitted).

Here, Krupa has shown little about her workplace environment beyond stray comments.  The most supportive evidence that Krupa could muster comes from her own deposition.  According to Krupa, one of her supervisors stopped a coworker from training her around the summer of 2011 and told her, "I thought the only thing you could do was push buttons.  I need you to get back over on the CNCs."  (Dkt. No. 39-2 at 3.)  For purposes of the pending motion, the Court accepts that a supervisor did make the comment and that he meant that he did not consider Krupa capable of complex tasks in the machine shop.  Even so, however, the comment occurred only once.  *Cf. Alfano*, 294 F.3d at 380 (finding no hostile work environment where 12 incidents over five years "were infrequent and episodic; half or more of them lacked any sexual overtone; and those that

22

did have a sexual overtone were difficult for an employer to remedy because they were largely anonymous"). The comment also occurred without context indicating that Dunkirk underestimated Krupa's abilities because she was a woman. Krupa has acknowledged that she suffered no other derogatory comments. (*See* Dkt. No. 33-6 at 78 ("Q. During the time you were employed at Dunkirk Specialty Steel, did any of your supervisors make any comments to you that you felt were derogatory towards you in terms of your gender? A. No.").) Krupa's preference for better restroom and locker room facilities does not support an allegation about a hostile work environment without more. *Cf. Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 119 (2d Cir. 2010) (finding an issue of fact where different reprimands over public restroom use combined with work assignments, the provision of tools, the use of a bucket truck, and verbal abuse); *Osier v. Broome Cnty.*, 47 F. Supp. 2d 311, 323 (N.D.N.Y. 1999) ("While plaintiff may not have wanted to use a bathroom also used by twenty-three male employees, no reasonable person could conclude that this was so severe as to alter her working conditions. There is no evidence that plaintiff was forced to use this bathroom because of gender-based discrimination. All janitors used that bathroom. Nevertheless, defendants acted reasonably by providing plaintiff with a list of female restrooms that she was permitted to use in order to accommodate any uneasy feelings she may have had about using the same rest room as male

employees."). If anything, Krupa risked making other coworkers uncomfortable through a sticker that she had placed on her toolbox. The sticker read, "Sexual harassment will not be reported; however, it will be graded." (Dkt. No. 33-6 at 79.) Under these circumstances, a reasonable jury would have no genuine, material fact disputes to resolve and would not find for Krupa under a theory of a hostile work environment.

### iii) Retaliation

The last Title VII theory that the Court will assess, again for the sake of completeness, is retaliation. "To establish a prima facie case of retaliation, an employee must show that (1) she was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action. However, in order to recover for retaliation for having filed such a complaint, the plaintiff need not prove that her underlying complaint of discrimination had merit." *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012) (citations omitted); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) ("[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.") (internal quotation marks and

citations omitted).  "An employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm *outside* the workplace." *Burlington*, 548 U.S. at 64 (citations omitted).  That said, though, "Title VII, we have said, does not set forth a general civility code for the American workplace.  An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* at 68.

Here, Krupa has not raised any factual questions about retaliation that require resolution by a jury.  Krupa alleges that she made numerous complaints to her supervisors about training and work responsibilities that she wanted but never received.  Apart from denying her requests, Dunkirk never did anything to Krupa in response to the act of complaining in itself.  Krupa's complaint to OSHA might have come closer to warranting a review by a jury if it had related to Title VII.  On October 28, 2011, one of Krupa's coworkers suffered a serious injury on a machine that lacked an unspecified safety guard.  Krupa notified OSHA of the incident on November 2, 2011; OSHA inspected the facility on November 8, 2011 and eventually issued a citation.  Just weeks later, on December 2, 2011, Dunkirk gave Krupa a three-day suspension for leaving her work area to pick up another coworker and to give him a ride to his worksite.  Krupa did not contest that she left her worksite but alleged that Dunkirk knew about the practice and

cracked down on it only after Krupa filed her complaint with OSHA.  What Dunkirk knew about Krupa's practices and why it disciplined her when it did should have prompted investigation during pretrial discovery.  If Krupa had provided the results of discovery with her opposition papers then she might have been able to make a *prima facie* case of retaliation *that related to Title VII.*  See 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice *by this subchapter* . . . .") (emphasis added); *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 205 (2d Cir. 2006) ("Title VII forbids an employer to retaliate against an employee for, *inter alia*, complaining of employment discrimination *prohibited by Title VII.*") (emphasis added).  Krupa attached no documentation or other evidence to her opposition papers, however.  In any event, the Court does not see any evidence suggesting that the OSHA incident had anything to do with sex discrimination under Title VII, as opposed to the OSHA whistleblower statute that Krupa already invoked.  (*See* Dkt. No. 33-2 at 6–8.)  Without some indication of a Title VII-related complaint and some adverse action taken in response to it, Krupa has no genuine and material dispute about retaliation that a reasonable jury would support.

26

Overall, then, the Court has reviewed the record and all of the motion papers and has found no genuine, material issue of fact to submit to a jury.

## IV) CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends granting Dunkirk's motion (Dkt. No. 33) for summary judgment and dismissing Krupa's complaint.

## V) OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below.  Any objections to this Report and Recommendation must be electronically filed with the Clerk of the Court within 14 days.  *See* 28 U.S.C. § 636(b)(1); FRCP 72.  "As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point."  *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted).

SO ORDERED.

__/s Hugh B. Scott_____    __

HONORABLE HUGH B. SCOTT
UNITED STATES MAGISTRATE JUDGE

DATED: October 15, 2014